Okay, we'll call the next case the estate of Philip Carl Martin verse Versus the United States Marshals Service at all Mr. Abiona. Good morning, Your Honor. Still morning? It's 11.20, I think. It's still morning. We don't want you to take us into the afternoon. I'll try not to, Your Honor. This is the court, Your Honor. We bring Abiona here representing the appellants in this case. Estate of Philip Carl Martin, Linda Martin, Dwayne Martin, and the other appellants. And with me here as co-counsel is Mr. William Joseph. Do you want to reserve time for rebuttal? Yes, Your Honor. May I reserve five minutes for rebuttal? That request will be granted. Thank you, Your Honor. Your Honor, the appellants are here appealing the several orders of summary judgment motion filed by some of the appellees in this case. And we do have several appellees, but I want to focus more on the dismissal of the plaintiffs or their parents' wrongful death, survival action, and the excessive use of force by the US Marshals with regards to Mr. Philip Martin's death. But I will answer whatever questions you have regarding the other issues in the case. But what you have here, I do believe, is the district court really ignoring several facts in this case that totally dispute the assertion of the US Marshals that Mr. Martin shot himself. Well, what evidence do you have that one of the Marshals shot Mr. Martin? Well, several, Your Honor. Number one, they were the only ones that undisputedly had their guns drawn that day that went upstairs. There is no evidence that Mr. Martin had any gun with him other than them saying that he did. Where did that come from? Where did that evidence come from? That's what, Your Honor. Where is the evidence that Mr. Martin didn't have a gun? Oh, several. Number one, the gun that they claim he had, there is no fingerprint or DNA of Mr. Martin on it. Well, there's no fingerprint or DNA of the Marshals either, is there? Well, we don't know because they didn't do it. That is their responsibility and that is part of where we're saying that they brought the investigation. They're the ones that had it in their possession. Well, we have the evidence from Mr. Martin's brother that he saw the Marshals at all times on the stairs. And we have evidence, I think, from your own expert, Mr. Binney, that would say that the placement of the gun had to have been inside the room, basically. So the way the room is set out, anyone, as I see it, on the stairway could not have made the shot and have it be consistent with what your own expert depicted in terms of where the shot came from. So what evidence is there that the Marshals or anyone on those stairs fired a gun that killed him? That means you should be ignoring the other Marshals' testimony that they actually went in the room, that they went past the stairs. There's so many disputed and inconsistent testimony from the Marshals that what they're saying does not even make sense. Number one, according to Mr. Johnson, the lead Marshal, he said he never got beyond the 13th step in the 14th step stairway. If you take that evidence and you can look at the pictures, there's no way you could have seen Philip Martin sitting on a TV at the other end of the room from Johnson's stairs. So if you look at just his own evidence, that is a totally false statement that he made on the oath. Then you look at his own statement that he is now producing new evidence in his deposition that he did not even put in his report. Were you correct that a lot of the Marshals gave evidence which was contradictory to each other? Yes, Your Honor. I'm having a problem, though, that, like in every case, there's contradictory evidence, even by the same side, against its own interest. Even given the contradictory evidence of the Marshals vis-a-vis one another, there's no evidence that anyone saw or circumstantial evidence that the Marshal discharged a firearm that killed the gentleman. Now you've got a couple of Marshals here. You've got to point it in. You can't say the Marshals. What evidence is there that any Marshal shot him? Well, Your Honor, that's where they have a problem because they're the only ones that had the guns drawn. And when you have them in the situation and the surrounding circumstances you have here, where they quickly have the other plaintiffs move out of the house and they're milling around inside the house, and then all of a sudden we have this gun with different locations, different testimonies of where it was, but this same gun that they claimed Mr. Martin used to kill himself, has no association of Mr. Martin with the gun. Well, it's true that the Marshals had guns and they came in with their guns shown, but there's also direct evidence that Mr. Marshall killed himself with the gun that was there. No, there's no evidence that he used that gun. There's no evidence that the officers used that gun either because if they had the guns drawn, they had glocks. Then you're assuming, Your Honor, that that was the gun that killed him because there's no ballistic evidence of where the bullet is and where it was gone. You're asking this court and you're asking the district court to speculate. No, I'm not asking the district court to speculate. One of the problems I have with your area of speculation, your line of speculation, is that even Duane Martin, the brother, said that Mr. Johnson didn't fire the weapon. He didn't say that, Your Honor. He said he didn't see it. The fact that he didn't see the officers shoot doesn't mean the officers didn't shoot. I mean, he wasn't trying his eyes. If he didn't see him shoot, he was the only family member that had a view of the officers going up the steps. That is the problem, Your Honor. There is no evidence from the way he was questioned that he had the view every time to see anything going on. You represent the plaintiff. That's correct, Your Honor. And you have the burden of bringing forth the evidence. That is true. The defendant doesn't have to eliminate all possibilities. You have to bring forth the evidence. Yes, but Your Honor, the evidence in the summary judgment motion that I have to bring is to show that there is evidence in the record from which a jury could have found... Let me ask you this, Mr. Aviano. Yes, Your Honor. You don't have that much time here. You're talking about the evidence, but you have a variety of claims here against different defendants. That's correct, Your Honor. Okay. And let me ask you specifically, why did the district court err in its analysis of the Fourth Amendment claim on the unreasonable search? Why was the district court in error? Okay. Because there are several unreasonable searches claims. There is that of... And you're talking about the entry of the U.S. Martins? Yes, the entry that led to the search. Well, Your Honor, I think that comes down to the Peyton case. Because in a situation where they have no such warrant to go into Mrs. Martins' house, where they say they're looking for someone, that they have no idea whether he lived in that house. But she tells them that he is there. And once she tells them he is there, they have the ability to go inside to arrest him with an arrest warrant. No, Your Honor. She didn't tell them that he was inside. On that Peyton, they must have known he resided there before they came to the front door. No. No. The action that you're challenging is their entry. And they did not enter until they were told that he was inside. Well, we're challenging not just the entry. We're challenging the search as well. You're challenging the fact that they came there to that house. Right. Without any probable cause that he lives there. Okay. Now, is it probable cause or reasonable belief? No. No. Sorry. Reasonable belief. Belief that he lived in the house. Okay. Now, they came there because they had on the old arrest warrant... 30 years before that. I understand there was that address. The Virginia authorities said he was living in New Jersey. He wasn't at the alleged girlfriend's residence. Right? That's true, Your Honor. Evidence that they didn't know he lived in the house. And they had valid arrest warrants. You can't challenge the fact that they had valid arrest warrants. Your Honor, the arrest warrant does not give them the right to go into Mrs. Martin's house. I understand that. But they get to this house, which they do know is his mother's house. Right? Well, they know it's his mother's house, but the files, Your Honor, nobody lived there for a year. It's a month down. They know it's his mother's house. They know it's 630 in the morning. Correct? Yes, Your Honor. They know it's 630 in the morning, but they didn't know anybody lived there for a year. And they get there, and their testimony is... Their testimony is that Mrs. Martin says her sons are in the house. Well, you see, that's the point. But they were not looking for her sons. They were looking for Philip Martin. And it was when they got in the house that they started finding out which one is Philip Martin. Payton stopped them at the door. That is what Payton does with regards to that unreasonable... But the doctor's testimony is she told him before he entered that her son Philip was there. Then that's for the jury to decide because she disputed that. But only through what is referred to in the law as a sham affidavit. No, but, Your Honor, she didn't say that in her deposition. That's a problem. She didn't say in her deposition that she told them at the door that Philip was in the house. And if I may, Your Honor, address a question about sham affidavit. Sham affidavit is when there was no other evidence to support whatever she said in her affidavit. You look at what she said when they interviewed her that morning on the day. Why was it improper to take Mrs. Martin and Dwayne to the police station? Your Honor, that is a violation of their right to be free and secure in their prison. They were not suspected of anything. There was no probable cause to take them. There was no arrest warrant for them. Somebody was shot. Somebody was killed. These are the other two residents of the home. Wasn't it reasonable to take them down and ask them investigative questions? No, not if they don't consent to it. Because then they are being arrested and they are being detained. Is their right to be free of that kind of investigative question clearly established? Absolutely, Your Honor. Where is it clearly established? What case clearly establishes it? Your Honor, even this Tosaki, in a different case, said that if an occupant of the bed... Which court said it? Sorry? Which court? Tosaki, Your Honor. This court. Okay. All right. Okay, we'll have you, you can look at that. We'll have you back on rebuttal. Thank you, Your Honor. Okay, now we have Mr. Bowman. Good morning, Your Honor. Good morning, Your Honor. May it please the Court, David Bilber from the U.S. Attorney's Office for the District of New Jersey for the Appellee Federal Marshals. I'll address both claims, the claim that the Court seemed to be interested in, the entry claim and the excessive force claim. I just want to start with the entry claim. I just want to correct something that Mr. Abiona just said. He said at her deposition, what he said was that Mrs. Martin, at her deposition, disputed and said that the marshals enter the home before she told him that Phillip was in the house. And that's completely incorrect. That's page 1698 of the record. Just reading from the deposition, this is a direct quote. Question, who did you tell them was in the house with you? Answer, my son Phillip and Duane. And what happened after that? Answer, they forced themselves in my house. That's her testimony. That would be enough to resolve the claim, but it's also supported by all of the other evidence in the case. At Duane's deposition, he was asked very similar questions. And, again, I'll quote it for the Court. This is cited in my brief, but I didn't block quote it like I did for Mrs. Martin's testimony. Question, did they ask for anything else? Answer, they asked for our names. Question, what did they ask? Answer, what our name was. Question, what did she respond? Answer, Duane and Phillip. What happened next? They came in. That's Duane's testimony. So the evidence that we're relying on, I think it's significant for the Court to realize, is we're not relying on the testimony or the evidence put forth by the marshals. To be clear, they allege that they got consent to enter the home, but we're looking at the facts and the light most favorable to the plaintiff. So we're looking at their version of the facts. So just looking at their version of the facts, there is no question as to what they testified. And just in case the Court needed anything else, there's a letter in the record that Linda wrote, dated March 23, 2008. So this is approximately two and a half months after this happened. It's at page 2377. She wrote it. She testified that it was shown to her at a deposition. She verified it was her signature on the letter. And this is what she wrote. The officer asked Linda who was in their home, and she indicated that her two sons, Phillip and Duane, were present. The U.S. marshals then stormed into their home. So there's absolutely no question on this record that these marshals, even looking at the plaintiff's version of the facts, did not enter the home until they knew that Phillip was in the home. And under Payton, all is progeny. That's all they needed. Does her affidavit meet the sham affidavit rule? Her affidavit is the classic sham affidavit. And if you look at the cases that we cite in our brief, one is the Behr v. Chase case and the other one is the Jimenez case. Behr v. Chase was a case that actually the dispute in that case was over the lawsuit against David Chase, the creator of the Sopranos. And the issue in that case was a statute of limitations case, and the plaintiff had testified at his deposition that he had no contact with Mr. Chase after I think the year was 1995. And then he came forward with an affidavit later on that said, actually I contacted him in 1997. And the issue was dispositive as to statute of limitations. And what the court said there was that the sham affidavit did not bar it because he had independent evidence to explain the change in his testimony. He produced a letter that was dated 1997 that Chase had admitted that he or Chase's assistant had admitted that she had received. And so in that case what the court said was it's not barred. It's not that every single declaration that contradicts sworn deposition testimony must be disregarded. It's that you need to provide a reason for why you're changing your testimony, something that the court can look at, because otherwise everyone could avoid summary judgment by putting in these kinds of affidavits. And then Jimenez's case, which came after the Bair versus Chase case, is a perfect example of the opposite. That case involved it was a fight outside of a bar, and I think it was a Monell claim against an off-duty police officer, something along those lines. But, again, the declarant put in an affidavit that was directly contradictory to her testimony, and the court goes through it all. Mr. Bober, let me ask you this. Doesn't Payton say that the officers who have an arrest warrant, if they enter a person's home, has to have reason to believe that the person they're looking for resides there and that the person is there at that time? Correct. And he does. Okay. How do you establish the fact that when they arrived at that house that they had reason to believe that Phillip was there, that Phillip resided there? Well, Your Honor, noted many of the facts already. In this case, it's very similar to Beal, but I can go through them. First of all, they had the admittedly older 13-year-old arrest warrant. Oh, wow. It was 13 years old, but it listed that as his address. Now, a lot of that time, they knew this, a lot of the intervening time he had spent in prison. And so they didn't just go to – In Virginia. In Virginia. But they knew from the marshals in Virginia that they had been searching for him and they were unable to locate him. They had cell phone records. This is page 667. They had a cell phone record. Did he use Dwayne's cell phone? They had cell phone records indicating he had used Dwayne's cell phone. Correct. He could have used that anywhere. It didn't show – at least the evidence didn't show where this phone was when it was used by Phillip. It did not show – we don't know from the record where it was used. We know that it was tied to Dwayne, and that public records show that Dwayne was using that cell phone. Okay. So what's that get you? You have 13 years. You have Dwayne's cell phone. What else? We have the fact that he – he visited the home of Sherry Boyce that morning. And the record that came – again, it's page 667 of the record. The record that came from the Virginia marshals noted there were several calls back and forth between her and Boyce. And so they went between – sorry, between that cell phone and Boyce's cell phone. So they went to that address first and ruled it out. Then they go to the house. Now, I fully concede and admit that at the time they approached the house, they had suspicion. They did not have certainty. But look at – Did they have reasonable belief? They had a reasonable belief. And when Dwayne was struck – Did they have reasonable belief? They had a reasonable belief that he resided there. Well, they had a – Well, they had suspicion at most. I'm sorry. They did not have reasonable – they had a suspicion that he resided there. It was reasonable for them. They didn't need much anything else to approach the house. Agreed. It's – there's nothing preventing them from knocking on the door and announcing themselves and attempting to gain consent, which in their version is what they did. When they approached the house, now look at Veal. Veal says, look at the totality of the circumstances. Right. And what are the facts in Veal? In Veal, one of the facts that the court noted in Veal – In Veal, we said they had a probable cause. Correct. And what were the two facts in Veal? Which may have been incorrect, right? Probably only reasonable suspicion is required, Your Honor, although I don't think you need to resolve it in this case. But in Veal, there are two facts. One, the officers know that they're looking for a fugitive who may be attempting to conceal himself. And two, it's reasonable to believe that if someone's there in the early morning hours, he either resides there or, and Veal made this clear, he doesn't even have to reside there. He only needs a significant connection to the house. And actually, if you read Judge Rehnquist's dissenting opinion in Payton, he dissented from the decision, but what he said is that the damage that will be done to law enforcement is somewhat reduced by the fact that a, quote-unquote, residence of a fugitive can be established by a stay in the house for as short as a couple of days. And so, looking at all those totality of the circumstances, it was certainly reasonable for him to approach the house. To the extent there was any doubt, it was removed, of course, when Mrs. Martin confirmed at the door that they were in there. And, as District Court correctly found – But that gives you reasonable belief that he was there. Does that also give you reasonable belief that he resided there? It did give them reasonable belief that he resided there because they had ruled out every other location that they could reasonably – that they reasonably could have looked for him at. And to the extent there was any doubt, as District Court found, that he would be protected by qualified immunity – I see my time has expired, Your Honor. Let me just finish. Okay, okay. I have not yet gotten to the excessive force point. If the Court would like to let me go over time, I can address it. Or if there were any questions – Take a minute. On the excessive force point, again, Your Honor, I believe hit the nail right on the head. Duane's testimony on this point is crystal clear. He could see the marshals from his vantage point. He could see them as they climbed the stairs. They were never out of his sight. They never left the steps. Well, that's just a statement of a witness. That's not an admission against interest. He's not a party to – he's a party to his own case, but not this case. So his statement is not binding on the plaintiff in this case. It might be binding on even his case. So that's just a statement of the witness. And what you have that's pretty tough for you is that each of the marshals contradict one another as to what happened. They contradict themselves, Your Honor, on – it's understandably minor points. You could paint them minor, but I don't think the plaintiff would say they were minor. They show that – they show perhaps they're not being truthful. I mean, that – I'm not saying they are or not, but I'm just saying that these are definite contradictions of fact. I think what the courts keep in mind is that all of the events that we're describing here took place in the span of a couple of seconds in an extremely high-stress environment. And the statements disagree with one another. Excuse me? And the marshals disagree with one another. I don't think there's significant disagreement. What they say – one testified that they maybe reached the landing on top of the steps. The other ones testify that they reached within two or three steps of the landing. Now, whether that's – There's more than that. There's more than that. They're disagreeing. All right. That's not the kind of material dispute that precludes summary judgment, especially when we know that from Duane's – even though he's only a witness, he's the only person other than the marshals themselves who all agree they never left the steps. Duane testifies they never left the steps. And we know they never left the steps. And then when you look at their own expert testimony – this is someone that – this is evidence that they prepared, not us – that shows that the bullet must have come from inside the room from a position consistent with a suicidal trajectory. And there's been no effort at all by the plaintiffs to explain how is it possible. Who fired that gun if the marshals never left the steps? Of course the answer is Philip Martin fired the gun. Okay, Mr. Bober, we understand your position, and we thank you. Thank you very much. We'll have Barbara Riefberg. Ms. Riefberg. You are arguing on behalf of the Camden County defendants? I am arguing on behalf of two representatives of the Camden County Prosecutor's Office. Okay. John Ellis, who was the crime scene investigator, and Gary McBride, who was the investigator who conducted the interviews of Duane and Linda Martin. Okay. Tell us why the district court was right as to its opinion involving your clients. Thank you. Well, in the first opinion, they granted some re-judgment as to John Ellis. John Ellis was the investigator who came upon the scene well after the shooting had already taken place. He was called upon to videotape and photograph the scene, take various measurements, and prepare a report, basically just a crime scene investigation. The main reason that the district court was correct in allowing him out of the case was to the extent that any of the allegations were that he had been negligent in his duties, those would be consumed within the New Jersey Tort Claims Act, and no Tort Claims Act notice was ever filed here, nor was there ever an application to file a late Tort Claims Act notice. And that was the primary basis for allowing John Ellis out of the case in the original opinion. There was also an indication that he was subject to and was allowed to avail himself of qualified immunity. Judge Sheridan, in his initial opinion, was very thorough, and he acknowledged at the time that he wanted some additional briefing as to the interrogation and or investigative questioning that McBride had with both Duane and Linda Martin. And so additional briefs were submitted, and then he issued a supplemental opinion. And in that supplemental opinion, for a lot of the same reasons, he did grant summary judgment to Investigator McBride. He found that under the circumstances, the questioning was relatively brief, was quite reasonable and appropriate under the circumstances when they're trying to investigate a death. The time frame of the questioning was entirely reasonable and appropriate. The transcripts and the tapes were provided. It was obvious that the tone of the investigatory questioning was very respectful and appropriate. And under the circumstances, similarly, he found that he was subject to qualified immunity and that there was no basis for a cause of action to proceed against him. Anyway, I mean, I'm not sure I understand what the exigent circumstances were to take Mrs. Martin down and keep her for three hours without shoes on. I'm not sure I understand the exigent circumstances there. It's a little different than the Mina case where they held a family member in the garage. Well, you have the situation where right then and there, it's a crime scene. There's an officer. Officers are involved. There's a shooting. There's a death. So right away, there's a crime scene. So they certainly need to remove the residents from the home while they're investigating the crime scene. They take them down to the police station, which isn't very far away, and McBride testified in his deposition. The reason he interviewed them at the police station is that's where he was told that they had been taken. And again, he questioned them on a fairly limited basis, and then later they were returned within a short period of time. Three hours. Well, that was the total time. That certainly wasn't the total period of time that he interviewed them. The interviews were about 11 and 8 minutes respectively. Did they have a right to interview them in the first place if they didn't want to be interviewed? Well, I think they had a reasonable right to investigate the incident. But if they didn't want to join in the investigation, what makes you think that they have a right to question her if she doesn't want to be involved in the investigation? Well, I think they had a reasonable right to ask her those questions, and she didn't refuse to answer. You don't answer my question. She doesn't want to go down to the police headquarters. Did she say anything? She never refused to answer their questions. She did say at one point, I believe, that she was cold. You didn't ask her for permission to take her, to remove her to police headquarters, did you? No. Yet you removed her to police headquarters, but she was alone there. Well, it wasn't either Officer Ellis or Officer McBride that removed her. Both of them testified they had nothing to do with the transport to the police station. McBride said he was asked to question her, and he was advised that she had already been taken to the police station. Well, even though they didn't remove her, they joined in the investigation by questioning her at police headquarters. Yes. I'm having a little trouble with what right you had to investigate her if she didn't consent to the investigation. She didn't have to say a word. Well, she did not have to, but she did. Obviously, if you read the transcript and or listened to the tape, she did give information. She did answer their questions. Your position, as I understand it, correct me if I'm wrong, is that her being removed to police headquarters and being interviewed was by reason of her consent, that she didn't have to, but she consented to be removed and questioned. No, I'm not saying consent. I'm saying under the circumstances they reasonably were conducting an investigation under exigent circumstances. That's not in doubt. That's not in doubt. But the question is not whether they were doing their job. It's whether or not part of that job allowed them to remove her from the crime scene to police headquarters for three hours and to question her without having her consent. Well, again, neither of them removed her. But she was removed, and they questioned her. In order for her to be questioned, they had to have someone remove her, and they partook in the investigation. That's correct. Someone did remove her. I mean, you justify that. She didn't consent to this. Well, again, I believe it's justified by the reasonableness of the removal of these two witnesses from an active crime scene that needed to be investigated, and it was reasonable to take them to the police station. You're not going to question them outside in the middle of winter. And she got to answer that all without her consent. Well, again, I do understand your position. I don't necessarily agree with that. You don't agree that she was removed without her consent and questioned without first getting her consent? You disagree with that? To some extent, I disagree with that. To what extent? To the extent that when they questioned her, she did answer their questions. She did not refuse to answer their questions. It's a rather intimidating process, maybe not for you or for me that have been around law enforcement, but for someone to be hauled down to police headquarters in a room surrounded by police officers who are armed and asked a few questions. It's not like something that you want to have experience that. Well, of course not. But, again, their obligation was to try to conduct a reasonable investigation, and all of that still fits within the qualified immunity. Okay. I think we understand your position now. Thank you. Okay, Mr. Rosenberg. Our next, Mr. Gallinaw, representing the Kandan, arguing on behalf of the Kandan Police Department. The City of Kandan Defense, yes, Your Honor. If I may, I'd like to point out that there have been some questions raised concerning whether it was right or wrong to take the Martins from the scene back to the police station. And I want the Court to recognize that that issue is not before you. Summary judgment is granted, as you all know from the record we have. One issue remained to be tried, and that was the question of whether or not it was appropriate for Officer Wiley to take the Martins from the scene to the station. And the jury ruled that it was appropriate, so his actions are not in question. But most importantly, that issue has not been appealed. So we have the situation where the factual circumstances surrounding the removal from the scene are really not at issue because the jury has decided that. My argument as to the other defendants basically deals with qualified immunity. Mr. Matthews, Detective Matthews, was Kandan City Police assisting Detective McBride in the interrogation. I think that the Court's reasoning with regard to qualified immunity is based on fact and very cogent, should not be disturbed. There is a question about whether the City of Kandan was even named as a defendant. There's no record that they were. Because the City of Kandan was not named as a defendant, there cannot be any Monell claims because they would only be applicable if there was sufficient evidence. That being said, I don't think there's sufficient facts or evidence to show any. Is there an Officer Phillips whose name? Lieutenant Phillips, yes. He is the individual who came on the scene after the shot was fired. And his role was to supervise what was happening at the scene, such as where officers were going to investigate. For example, he came on the scene. He supervised the scene when the special forces, usually referred to as the SWAT team, came on the scene. And they went in to investigate. He had, I'd say, overall control. There's no evidence in the case to show that he did anything that would be considered wrong, except that he was supervising. What's the City of Kandan made a party to this when they got the March letter? Maybe the Officer at his official capacity does that bring Kandan? Into the case? Your Honor, for Kandan to be brought into the case, they have to be named in the complaint. Even though the Officer is named in his official capacity as an officer of Kandan? Yes, Your Honor, because especially when you're talking about 1983, you can have a 1983 claim against an individual officer acting in his official capacity, and that's a far cry from a Monell claim, which would be against the City of Kandan. So if you want to proceed against the City of Kandan, it's imperative that they be named as a defendant at some point in time. And as I pointed out in my brief, there was evidence given to the plaintiffs at the time to indicate that the City was not named as a defendant and no action was taken. Well, is there deliberate indifference by reason of the acquiescence, seeing the letter and doing nothing by Kandan? Judge, I don't think so. I don't think it's incumbent upon anybody to tell somebody how they have to go about suing them. So I would say no. Okay. Mr. Gallo, thank you. We understand your position. Thank you. And we'll hear from Mr. Goldberg on behalf of the Kandan County Board of Freeholders. Thank you. Mr. Goldberg. And please record how I'll go for the First Assistant County Counsel. I represent the Board of Chosen Freeholders. Would you raise your voice a little bit? I'm sorry. I represent the Board of Chosen Freeholders. I represent the medical examiner, Gerald Feigen. And I represent Patrick Daly, who was an investigator with the medical department. It appears to me from the papers that were filed that the only appeal has taken us to Gerald Feigen, because there was no suggestion that there was anything incorrect about Judge Sheridan's opinion with respect to Patrick Daly, for whom no evidence was ever adduced, or the Board of Chosen Freeholders. With respect to defendant Gerald Feigen, the claims were a little bit confusing, but the claims were that there were civil rights violations, despite the fact that Dr. Feigen had no contact with the decedent until after he was deceased. He was not part of any action with the marshals. He simply performed the autopsy. The allegations in the complaint suggesting equal protection arguments were that he somehow produced that autopsy in a discriminatory manner, that he treated African American decedents somehow differently than other decedents, and there was no evidence adduced to that effect. So in response to the summary judgment motion, the claim was changed somewhat to suggest that there was an equal protection claim as to victims of suicide, but there was no suggestion as to how that became an equal protection claim. So the judge ruled essentially there was no standing, and he ruled correctly because the plaintiffs had no standing to assert a civil rights violation on behalf of the decedent, and there are no civil rights that can be violated once the individual is deceased, and that's the first time that Dr. Feigen had contact. The only other claims were state court claims. I'm sorry, there was a conspiracy claim, but again, Judge Sheridan ruled, and I think absolutely correctly, that there was no evidence of a conspiracy, and my brief set forth and his opinion was very clear on that. With respect to the state law claims, there was never a tort claim filed. There was a letter allegedly that was sent to some people but not to any of my clients, and it was not a tort claim notice in any event. Given that, unless your honors have any questions, I have no other comments. All right, thank you, Mr. Goldberg. Thank you. Mr. Arianna? Yes, Your Honor. First of all, I'll give you the case law that I was referring to earlier on, which is the one that counsel addressed, that is United States v. Veal, where the court held, let's see, Your Honor, where the court said there are two prongs for the government to determine whether it requires officers to have a reasonable leave that the arrestee leaves in the residence and was there. So even if they were going to use Ms. Martin's deposition to say that he told them before they entered that he lived there, in spite of the fact that on the day of this incident, when they were interviewing her, she told them, and it's in the transcript, that it was after they came in that they asked her if Philip lived in the house. But they did not meet the prongs in patent. That's number one. I want to address very quickly what the counsel for the city said because I want to make it very clear. Because he made an erroneous statement. The trial that we have of Officer Wiley did not establish that they have the right to remove any of these individuals to the police department. The only trial about Mr. Wiley was whether Officer Wiley was the person who transported them. Whether what? Whether Officer Wiley was the officer that transported them to the police station. That was the only factor in which the jury was deciding. And if the jury decided Officer Wiley didn't take them, it didn't mean that any officer or the city of the county police officers who took them had the right to do it, did not violate their right. So I just want to correct that statement, Your Honor. Also, the city said that the city was not to be used as a defendant. That is not true. Look at paragraph 26 of the Second Amendment complaint. Were they served? Was the city served? Yes, they were served, Your Honor. Apparently, they don't know that they were. The city entered a penance. But what I'm saying is we sued the County City Police Emergency Response Team. That is an agency within the city of Camden. But we also sued on paragraph 30. And we said Defendant City of Camden Police Department. The case law is very clear. Are they in the caption? Yes, Your Honor. They were in the caption. If they didn't answer, are you sure they were served? Did you refer people? They answered, Your Honor. Pardon? They answered. The city answered because a different council represented the city. They answered the complaint. In fact, they never made the argument that they were not served or were not part of the case. It was the judge that said that he did not see them as a defendant in the case. But the case law is very clear, Your Honor. When you sue a police department of a city in the official capacity, it is. Yeah, well, I mean, that's the question I asked the council. His response is what I understand, that you have to designate the entity by suing the police officer. He's suing the police officer, but even though he sued officially, it doesn't bring in the municipal government. Your Honor, you're right. Because I've had cases where we even sued the officers in the official capacity. And the city moved to remove the officer as a defendant because the officer in the official capacity sued the city, and the city was substituted for the officer. That is case law. And we provided that. So to say that the city was not served or was not sued is legally incorrect. And you look at it, we named it as a defendant city of Canada Police Department. And they were represented. But to address the issue of the tort claims, and it's clearly in the brief, Your Honor. Let me ask you something. Getting back to the city. Yes, Your Honor. Did you actually serve the city itself? We served the city, and we served all the police officers in their official capacity. And who did you serve in the city with this claim? I believe we served the city solicitor's office, Your Honor. I believe on behalf of... Oh, you served the police officer. Yes, we served the police officers in their official capacity, and then we also served the police department. The Canada Police Department was served. Okay. And I think all that is in the docket, Your Honor. We were served, and the return of service and everything is in the docket. Okay. I believe Judge Rondeau was asking, you know, whether or not Ms. Martin, you know, answered the question that gave them consent. If you look in the interview of Ms. Martin at the police station, Your Honor, she consistently told Detective McBride, I don't want to be here. I'm cold. She's in her pajamas, barefooted. We even asked Detective McBride during his deposition, did you even offer to give her coffee? Because you say you're bringing them here not to investigate, but you are, that they were, you know, they've just gone through a serious situation at their home. They don't want to be there. They don't have to be taken to the police station. Yes, you can remove them from the house, but they can go to their neighbor's house and stay there. It's cold on January 8th, at 6 o'clock in the morning, Your Honor. They don't have to go there. It gives them consent, and she consistently told them. And what else did they do? The city police also put them in handcuffs and put them in the car. What? Isn't that holding them under arrest? What for? We don't consent to that. We don't have that individual who did that before us, do we, Your Honor? Well, Your Honor, you have the city of Camden Police Department, and you have Lieutenant Phillips, who was the ward commander, who was also like the chief of police at the scene. He was investigating, correct, at the scene? He was investigating at the scene. No, he wasn't investigating. He was the chief. He was the one commanding the officers and giving authority for everything that is being done. He was the one that brought in the SWAT team. He wasn't investigating anything. He was the one, the top supervisor at the scene, that had the power to authorize anything that is going on by Camden City Police officers. And so my time is up, Your Honor. Okay. Thank you, Mr. Adeyemana. Thank you very much. And we thank counsel for their arguments in this case. They're helpful, and we'll take the matter under advice. Thank you. All rise. This court is adjourned until Thursday, April 7th, at 10 a.m.